UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS J. DOLAN
        Plaintiff,


        v.                                    CIVIL ACTION NO.
                                              10-10249-NMG

RALPH TAVARES,
in His Individual Capacity,
        Defendant.

**REPORT AND RECOMMENDATION RE:
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(DOCKET ENTRY # 28)**

**May 16, 2011**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment
(Docket Entry # 28) filed by defendant Ralph Tavares
("defendant") pursuant to Rule 56, Fed. R. Civ. P.


PROCEDURAL BACKGROUND

On February 17, 2010, plaintiff Thomas J. Dolan
("plaintiff") filed an amended complaint (Docket Entry # 5) in
which he raises a federal claim against defendant pursuant to 42
U.S.C. § 1983 ("section 1983") (Count I).  Count One alleges that
defendant violated plaintiff's First and Fourteenth Amendment
rights by constructively evicting him from a public law library
and preventing his continued access to that library.  Plaintiff
also raises various state law claims against defendant for

1

violating plaintiff's rights under the Massachusetts Civil Rights Act, section 11I of Massachusetts General Laws chapter 12 (Count IV); defamation (Count VII); intentional infliction of emotional distress (Count VIII); and intentional interference with advantageous relationships (Count IX).

On August 6, 2010, the court issued a Memorandum and Order (Docket Entry # 15) allowing in part and denying in part a motion to dismiss (Docket Entry # 11). The court dismissed all claims against Diane Connell (counts II and V) and all claims predicated on alleged collusion between Tavares and Connell (counts III and VI). Only those claims filed against defendant individually (counts I, IV, VIII and IX) remain. The court also granted the parties 90 days to complete fact discovery on the issue of qualified immunity. (Docket Entry # 15).

Defendant moves for summary judgment on the section 1983 claims on the basis of qualified immunity. According to defendant, plaintiff has failed to show that defendant violated his First Amendment rights.[1] Defendant further contends that

_____

[1] Defendant's memorandum in support of his motion for summary judgment only addresses plaintiff's primary First Amendment claim. Defendant explains he need not argue plaintiff's retaliation claim separately from plaintiff's library access claim because the elements of these claims are essentially the same. Thus, according to defendant, if plaintiff's library access claim fails, plaintiff's retaliation claim must also be dismissed. (Docket Entry # 29, fn. 4). Moreover, defendant argues he need not address plaintiff's Fourteenth Amendment due process claim because the only "deprivation" plaintiff alleged is of his First Amendment rights. Consequently, defendant submits that if this court dismisses plaintiff's First Amendment claim,

even if this court finds plaintiff has made such a showing, defendant is still immune from suit because plaintiff's rights were not "clearly established" such that a reasonable official in defendant's shoes would have known that his conduct was unconstitutional. Defendant also requests that upon dismissing plaintiff's section 1983 claims, this court either decline to exercise supplemental jurisdiction over the remaining state law claims or grant summary judgment on those claims as well. (Docket Entry # 28).

On February 4, 2011, this court held a hearing and took the motion for summary judgment (Docket Entry # 28) under advisement.

STANDARD OF REVIEW

Summary judgment is designed "to pierce the boilerplate of the pleadings and assay the parties proof in order to determine whether trial is actually required." <u>Davila v. Corporacion De Puerto Rico Para La Difusion Publica</u>, 498 F.3d 9, 12 (1st Cir. 2007) (citation and internal quotation marks omitted). Summary judgment is appropriate when the record shows "there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the

_____

plaintiff's Fourteenth Amendment claim must also be dismissed. (Docket Entry # 29, fn. 4).

3

non-moving party." American Steel Erectors, Inc. v. Local Union No. 7, International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Id.

"The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (citation, internal brackets and internal quotation marks omitted). "After such a showing, the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." Hinchey v. Nynex Corporation, 144 F.3d 134, 140 (1st Cir. 1998) (citation and internal quotation marks omitted).

The nonmoving party, who bears the ultimate burden of proof, may not rest on allegations in his briefs, Borshow Hospital & Medical v. Cesar Castillo, 96 F.3d 10, 14 (1st Cir. 1996), "but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995). The court must examine the facts in a light most favorable to the non-moving party and resolve any reasonable inferences in that party's

favor.  Dasey v. Anderson, 304 F.3d 148, 153 (1st Cir. 2002).

　　Summary judgment relative to the qualified immunity defense presents a tension because the former "requires absolute deference to the nonmovant's" facts whereas the latter "demands deference to the reasonable, if mistaken, actions of the movant." Morelli v. Webster, 552 F.3d 12, 19 (1st Cir. 2009).  Morelli instructs "to cabin these standards and keep them logically distinct, first identifying the version of events that best comports with the summary judgment standard and then asking whether, given that set of facts, a reasonable officer should have known that his actions were unlawful."  Id.; see, e.g., Brett v. Temkina, 2006 WL 167496 (D.Mass. Jan. 23, 2006) ("'relevant question is whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct.'") (citing Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 91 (1st Cir. 1994)).  Prior to engaging in this inquiry, however, a court must first determine whether the plaintiff has "introduced sufficient evidence to create a genuine issue of material fact" that defendant violated plaintiff's constitutional rights.  Febus-Rodriguez, 14 F.3d at 91; see Souza v. Pina, 53 F.3d 423, 425 (1st Cir. 1995).

　　Viewing the summary judgment facts in plaintiff's favor, they show the following.  Disputed facts are resolved in favor of plaintiff.

Plaintiff is a resident of New Bedford, Massachusetts. (Docket Entry # 30, ¶ 1; Docket Entry # 34, ¶ 1). At all relevant times, defendant was employed as a court officer for the Bristol County Superior Court located at 441 County Street in New Bedford ("the courthouse"). (Docket Entry # 30, ¶ 2; Docket Entry # 34, ¶ 2). The instant action arises out of events occurring on February 22, 2007, in the Commonwealth of Massachusetts's Trial Court Law Library ("the law library") located on the second floor of the courthouse. (Docket Entry # 5, ¶¶ 11 & 12; Docket Entry # 18, ¶¶ 11 & 12).

Between March 2, 2006 and February 22, 2007, plaintiff frequented the law library to conduct research regarding his First Amendment rights to use the law library and Fourteenth Amendment right to due process in connection with Dolan v. New Bedford, Civil Action No. 09-10171-JLT, a section 1983 action plaintiff filed on February 5, 2009. (Docket Entry # 35, ¶ 5). That case was settled on February 1, 2010, and plaintiff filed the present action on February 12, 2010. (Docket Entry # 35, ¶ 5).

On the morning of February 22, 2007, while plaintiff was conducting research in the main part of the law library, two men entered and began conferencing. (Docket Entry # 35, ¶ 17). Plaintiff "endured" the conferencing for some time "hoping that

it would end soon." (Docket Entry # 35, ¶ 18). When the conferencing did not end and plaintiff felt it was not about to end, he approached the men, informed them of the law library's ban on conferencing and asked them to comply with the rule. (Docket Entry # 35, ¶¶ 18-20). The men stopped conferencing without confrontation and stepped outside the law library to continue their conference. (Docket Entry # 35, ¶¶ 21-23). Plaintiff resumed his work. (Docket Entry # 35, ¶ 23).

About a minute or so later, Diane Connell ("Connell"), the librarian on duty, went over to where plaintiff was seated, stood in front of him and "began scolding and berating" him for confronting the men about conferencing. (Docket Entry # 35, ¶ 24). Connell told plaintiff that "(i) the two gentlemen who had been conferencing in the public law library were doing good work; (ii) their conferencing had not bothered *her*; and (iii) [he] should have spoken to *her*, Connell, and not to them, about their conferencing." (Docket Entry # 35, ¶ 25) (emphasis in original). Plaintiff replied that, "[R]egardless of whether their conferencing had interfered with *her* thinking, or not, it had interfered with [his] thinking--and it had violated the public law library's own rule."[2] (Docket Entry # 35, ¶ 26) (emphasis in original). According to plaintiff, Connell responded, "Well then

_____

[2] Plaintiff had previously complained to Jane Callahan ("Callahan"), the head librarian, about other patrons violating library rules and Callahan told plaintiff it was okay for him to inform other patrons about the rules. (Docket Entry # 35, ¶ 16).

maybe we [the library] should rethink the rules." (Docket Entry # 35, ¶ 27). At that point plaintiff stopped replying to Connell and continued his research. (Docket Entry # 35, ¶ 30). Connell left "in a huff." (Docket Entry # 35, ¶ 31).

During the afternoon of February 22, 2007, plaintiff moved to the auxiliary part of the law library and began drafting a petition of redress (Docket Entry # 35, Ex. B) for the interference with his First Amendment right to freedom of thought in the law library. (Docket Entry # 35, ¶ 33). While plaintiff was seated at a computer working on his petition, defendant, who was accompanied by an armed police officer, interrupted plaintiff's writing and referred to it as "legal jargon." (Docket Entry # 35, ¶ 33). Defendant introduced himself and the police officer who would be stationed near plaintiff in order to supervise him. (Docket Entry # 35, ¶ 34). Defendant told plaintiff that he had received reports that plaintiff made people feel uncomfortable and that, "You will be arrested! I have the power to do that!"[3] (Docket Entry # 35, ¶¶ 34 & 36).

Defendant did not tell plaintiff what he had done wrong or what he had to do or refrain from doing in order to avoid arrest. (Docket Entry # 35, ¶ 37). In fact, plaintiff was never charged

---

[3] Defendant's statement of undisputed material facts contends that the statement was that "if [plaintiff] 'did not behave himself' that he would have [plaintiff] arrested and that [defendant] had the authority to do so." (Docket Entry # 30 at 3). The court resolves the dispute in plaintiff's favor for purposes of resolving the summary judgment motion.

with violating any of the law library's rules or with breaking any law. (Docket Entry # 35, ¶6). Plaintiff asked defendant to provide him with something in writing but defendant declined to do so. (Docket Entry # 35, ¶¶ 38 & 39). Plaintiff also asked defendant if he could ask him a question and defendant again declined. (Docket Entry # 35, ¶¶ 40 & 41). After this exchange, defendant left the auxiliary part of the law library. (Docket Entry # 35, ¶ 42). Plaintiff then asked the police officer if he could ask him a question but the officer also declined. (Docket Entry # 35, ¶ 43).

"Unnerved, unable to think freely, and worried about being arbitrarily arrested at [defendant's] command," plaintiff stopped drafting the petition (Docket Entry # 35, Ex. B) and left the auxiliary part of the law library. (Docket Entry # 35, ¶¶ 44-46). As plaintiff was leaving, the officer asked plaintiff when he would be returning. (Docket Entry # 35, ¶ 47). Plaintiff responded that he "could not think straight with a police officer hovering over [his] head--not to mention the threat of arrest that hung, by a thread, in the air." (Docket Entry # 35, ¶ 33).

On his way out of the law library, plaintiff ran into defendant and again asked defendant if he could speak with him. (Docket Entry # 35, ¶ 48). After defendant initially refused to speak with plaintiff, plaintiff persuaded defendant to speak with him in his office. (Docket Entry # 35, ¶¶ 49-51). Once inside defendant's office, defendant told plaintiff that it was his

constant presence at the law library that made people uncomfortable.[4] (Docket Entry # 35, ¶ 52). He said to plaintiff, "You're always here" "You're here all the time. What's taking you so long!" (Docket Entry # 35, ¶ 53). When plaintiff explained that he was researching long standing constitutional law principles, defendant responded by telling plaintiff that he was "intelligent enough to find some other place" to conduct his research and advised him to do so.[5] (Docket Entry # 35, ¶¶ 54 & 55). Defendant also advised plaintiff not to visit the law library as often because his constant presence made other patrons uncomfortable. (Docket Entry # 35, ¶ 56). During their conversation, defendant also brought up "an outburst" that had allegedly occurred that morning, which plaintiff refuted. (Docket Entry # 35, ¶ 59).

Before leaving defendant's office, plaintiff wrote down his e-mail address, gave it to defendant, and asked defendant to

---

[4] In contrast, defendant contends that he approached plaintiff on the day in question because he was "concerned about a potential disruption" (Docket Entry # 30, Ex. A, ¶ 2) and wanted to ensure that plaintiff "not cause any disturbance in the law library and to ensure that he complied with library policy." (Docket Entry # 30, Ex. A, ¶ 3). According to defendant, he was concerned that plaintiff was "disturbing other patrons in the library" and that plaintiff had been "involved in a verbal altercation with Diane Connell, a librarian, earlier in the day." (Docket Entry # 30, Ex. A, ¶ 2). Again, this court resolves the dispute in plaintiff's favor.

[5] Defendant contends that he neither suggested nor said to plaintiff "that he was forbidden from using the law library or from returning to the law library at any point in the future." (Docket Entry # 30, Ex. A, ¶ 4).

"notify [him] of anything else that might occur to [defendant], or come to his attention" about what plaintiff may have said or done to make other patrons uncomfortable so that he could rectify the matter.  (Docket Entry # 35, ¶¶ 60 & 61).  Defendant told plaintiff, "You'll be the first to know" (Docket Entry # 35, ¶ 62) but plaintiff never heard from defendant.  (Docket Entry # 35, ¶ 63).  Plaintiff 's mailing (Docket Entry # 35, Ex. D) to defendant also went without a response.  (Docket Entry # 35, ¶ 64).

Plaintiff felt that as a result of what had occurred he was left with little choice.  (Docket Entry # 35, ¶ 65).  He could "frequent the public law library as [he] had in the past, and face the very real risk of being placed under armed guard and/or being arbitrarily arrested on [defendant's] command; (b) [he] could agree to abridgment of [his] future use of the public law library, and face the same risks; or (c) [he] could play it safe and stay away."[6]  (Docket Entry # 35, ¶ 65).  Plaintiff felt he "would not be _free_ to *frequent* the public law library and *think freely* there."  (Docket Entry # 35, ¶ 66) (emphasis in original).  He also felt he could not afford to run the risk of being

_____

[6] Defendant contends that he never intended to infringe nor actually infringed any of plaintiff's constitutional rights. (Docket Entry # 30, Ex. A, ¶ 5).

"arbitrarily arrested."[7]  (Docket Entry # 35, ¶ 68).  As a result
of what plaintiff alleges were "conditions of threat,
intimidation, inhibition, and duress created by [defendant],"
plaintiff stopped visiting the law library after February 22,
2007.  (Docket Entry # 35, ¶ 69).

## DISCUSSION

### I.  Qualified Immunity

In January 2009, the Supreme Court reiterated that qualified
immunity is a two step inquiry.  Pearson v. Callahan, 55 U.S.
223, 129 S.Ct. 808, 815-816 (2009); see Maldonado v. Fontanes,
568 F.3d 263, 269 (1st Cir. 2009) (discussing Pearson and
adhering to "the Court's two-part test" thereby abandoning First
Circuit's previously employed three step analysis).  Under this
revised framework, "a court must decide:  (1) whether the facts
alleged or shown by the Plaintiff make out a violation of a
constitutional right; and (2) if so, whether the right was
clearly established at the time of the defendant's alleged
violation."  Estrada v. Rhode Island, 594 F.3d 56, 62-63 (1st
Cir. 2010) (internal quotation marks and brackets omitted).
These two steps "need not be considered in any particular order,
and both prongs must be satisfied for a plaintiff to overcome a

_____

[7] In contrast and according to defendant, he never "state[d] that
anything negative whatsoever would happen to [plaintiff] if he
continued using the law library."  (Docket Entry # 30, Ex. A, ¶
4).

qualified immunity defense." <u>Raiche v. Pietroski</u>, 623 F.3d 30, 35 (1st Cir. 2010). The second prong entails ascertaining "the clarity of the law in general at the time of the alleged violation; and (b) the clarity of the law as applied to the case-in other words, whether a reasonable person in the defendant's shoes 'would have understood that his conduct violated the [p]laintiff's constitutional rights.'" <u>Raiche</u>, 623 F.3d at 36 (citing <u>Maldonado</u>, 568 F.3d at 269-270). This prong is "'highly fact specific.'" <u>Estrada</u>, 594 F.3d at 63.

According to defendant, he is entitled to qualified immunity and plaintiff's section 1983 claim should be dismissed because plaintiff cannot meet either prong of the qualified immunity test. (Docket Entry # 29). That is, defendant argues that plaintiff has failed to a show a violation of his constitutional rights (Docket Entry # 29) and even if this court finds plaintiff made such a showing, the rights at issue were not so clearly established that a reasonable official would have known his conduct was unconstitutional. (Docket Entry # 29).

With the foregoing framework in mind, this court turns to each of plaintiff's section 1983 claims.

A. <u>First Amendment Library Access Claim</u>

The amended complaint sets out a section 1983 claim against defendant alleging, *inter alia*, that defendant violated plaintiff's First Amendment rights by constructively evicting him

13

from the law library and preventing his continued access to that library. (Docket Entry # 5, ¶¶ 62-65). Plaintiff contends that defendant violated his First Amendment rights to be in, read, write and think freely in the law library. (Docket Entry # 5, ¶¶ 62-65).

A plaintiff may recover damages from a state official who, while acting under color of state law, commits a constitutional violation. 42 U.S.C. § 1983. In order to prevail on a section 1983 claim, the plaintiff must prove two elements: 1) "that the defendant has deprived him of a right secured by the Constitution of the United States;" and 2) that the defendant deprived the plaintiff of his constitutional rights while acting under "color of state law." Adickes v. S.H. & Co., 398 U.S. 144, 150 (1970) (internal quotation marks omitted).

Access to public libraries implicates the First Amendment. Wayfield v. Town of Tinsbury, 925 F.Supp. 880, 888 (D.Mass. May 21, 1996); see Kreimer v. Bureau of Police, 958 F.2d 1242, 1264-65 (3rd Cir. 1992) ("First Amendment protects the right to reasonable access to a public library"); Hunt v. Hillsborough County, 2008 WL 4371343, *3 (M.D.Fla. Sept. 22, 2008) (the plaintiff has "fundamental right to access the Law Library and receive the information provided therein"); Armstrong v. Dist. of Columbia Public Library, 154 F.Supp.2d 67, 82 (D.D.C. Aug. 21, 2001) ("access to a public library . . . is at the core of our First Amendment values"). In order to show a First Amendment

14

violation, a plaintiff must show that the defendant intended to inhibit speech protected by the First Amendment, <u>Tatro v. Kervin</u>, 41 F.3d 9, 18 (1st Cir. 1994), and that the defendant's conduct had a chilling effect on the protected speech that was more than merely 'speculative, indirect or too remote.'" <u>Sullivan v. Carrick</u>, 888 F.2d 1, 4 (1st Cir. 1989); <u>see</u>, <u>e.g.</u>, <u>Willoughby v. Town of Tisbury</u>, 2010 WL 4502290 (D.Mass. Nov. 10, 2010). The proper inquiry is "whether the defendant's actions would deter a 'reasonably hardy individual . . .' from exercising his constitutional rights." <u>Barton v. Clancy</u>, 632 F.3d 9, 29 (citing <u>Agosto-de-Feliciano v. Aponte-Roque</u>, 889 F.2d 1209, 1218 (1st Cir. 1989)).

### (1)  Prong One:  Constitutional Violation

In order for plaintiff to defeat defendant's motion for summary judgment on the basis of qualified immunity, this court must determine whether plaintiff sets forth sufficient evidence to establish a First Amendment violation.

### (a)  Intent to Inhibit

According to defendant, plaintiff cannot establish a prima facie case of a First Amendment violation because he has failed to show that defendant intended to inhibit plaintiff's First Amendment rights.  (Docket Entry # 29) (citing <u>Sheridan</u>, 2003 WL 22050773 at *4).  This court disagrees.

The First Circuit in <u>Tatro v. Kervin</u> set out a "but for"

standard of proof regarding the element of intent in section 1983 actions alleging First Amendment violations.  Tatro v. Kervin, 41 F.3d at 18 (adopting "but for" standard applied in mixed motive employment discrimination cases to First Amendment violations). In order to prevail on a First Amendment claim under Tatro, the plaintiff "need not show that defendant's *sole* motive was to chill the plaintiff's protected expression."  Id.  The plaintiff only needs to show that the defendant's intent to inhibit his First Amendment rights was "the *determining* or *motivating* factor" underlying the defendant's conduct, such that "'but for' that determining factor" the defendant would not have engaged in the conduct at issue in the case.  Id. (emphasis in original).

Furthermore, in deciding motions for summary judgment, it is widely recognized that questions of motive and intent will generally preclude a court from granting summary judgment.  See, e.g., Perez-Perez v. International Shipping Agency, Inc., 2008 WL 1776396 at *3 (D.P.R. Feb. 7, 2008) (citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 677 (1st Cir. 1996) (reversing summary judgment)).  As explained by the First Circuit in Pettiti v. New England Tel. & Tel. Co., lower court's allowance of "determinations of motive and intent . . . are questions better suited for the jury, as proof is generally based on inferences that must be drawn, rather than on the proverbial smoking gun." Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 34 (1st Cir. 1990).  "Even in cases where elusive concepts such as motive or

intent are at issue, [however,] summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences [or] unsupported speculation." Ayala-Genera v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996).

Defendant argues that plaintiff has not provided any evidence to show that defendant was motivated by a desire to infringe upon plaintiff's First Amendment rights and therefore he is entitled to summary judgment. According to defendant, "the Amended Complaint on its own terms suggests that [defendant] was motivated out of a desire to maximize all patrons' ability to use the law library." (Docket Entry # 29). Referring to his affidavit, defendant explains that he "never intended to interfere" with plaintiff's constitutional rights and that he only spoke with plaintiff out of concern about his negative impact on the other library patrons. (Docket Entry # 29). Moreover, defendant contends that none of plaintiff's allegations suggest that defendant was motivated by a desire to infringe upon plaintiff's First Amendment rights and that plaintiff "has demonstrated no facts impugning [defendant's] explanation of his motive." (Docket Entry # 29).

Contrary to defendant's argument, however, plaintiff provided sufficient evidence for a reasonable jury to determine that "but for" defendant's intent to infringe upon his First Amendment rights to be in and use the law library, defendant

17

would not have placed plaintiff under police supervision, threatened him with arrest, or requested that he refrain from visiting the law library as often.  For instance, while defendant alleges that he approached plaintiff out of concern that plaintiff was negatively impacting other library patrons (Docket Entry # 29), defendant never provided plaintiff with any information regarding the substance of the complaints received from other patrons other than the fact that he made other patrons uncomfortable.  (Docket Entry # 35, ¶ 37).  Also, despite numerous attempts by plaintiff to inquire about what he should do or refrain from doing in order to avoid arrest, defendant refused to answer plaintiff's questions or provide him with something in writing.  (Docket Entry # 35, ¶¶ 37-39).  Defendant never identified a patron by name who plaintiff made uncomfortable.  He also never charged plaintiff with breaking any of the library's rules or with violating any law.  (Docket Entry # 35, ¶ 6).  When defendant finally agreed to speak with plaintiff, defendant urged plaintiff to find "some other place" to work and advised plaintiff "not to come to the public law library so much." (Docket Entry # 35, ¶¶ 55 & 56).

Based on plaintiff's evidence, a reasonable jury could determine that the motivating factor underlying defendant's conduct toward plaintiff was an intent to restrict plaintiff's access to the law library.  A reasonable trier of fact could find that but for his desire to infringe upon plaintiff's First

18

Amendment rights, defendant would have approached plaintiff or spoken with plaintiff about his conduct at the library, prior to placing him under police supervision. Similarly, defendant may have disclosed to plaintiff the substance of the reports he received against him or at the very least tell plaintiff what rule he was breaking or what he should do in order to continue using the library freely. Defendant also would not have advised plaintiff to refrain from visiting the law library as often.

Viewing the record in a light most favorable to plaintiff, an issue of fact exists with respect to defendant's intent that can only be resolved by a trier of fact. Therefore, summary judgment is inappropriate.

### (b) Chilling Effect

Defendant also argues that plaintiff has failed to demonstrate a violation of his First Amendment rights because defendant's conduct would not "chill or silence a person of ordinary firmness from future First Amendment activities." (Docket Entry # 29) (citing Sheridan v. DeHart, 2003 WL 22050773 at *4 (D.N.H. Sept. 3, 2003)). According to defendant, plaintiff's allegation that defendant's conduct "*discouraged* him from accessing the [public] law library (even if assumed to be true) does not rise to the level of a First Amendment violation." (Docket Entry # 29). Defendant contends that while federal courts have held that "Under some circumstances, indirect

'discouragements' undoubtedly have" a "coercive effect upon the exercise of First Amendment rights," <u>Georgine v. Amchem Products, Inc.</u>, 160 F.R.D. 478, 511 (E.D.Pa. Feb. 28, 1995) (collecting cases), the conduct at issue in cases where "discouragement" was held unconstitutional was a "substantially [more severe] impediment to First Amendment activity than any action taken by [defendant]." (Docket Entry # 29). Again, this court disagrees.

While not all "discouragement" amounts to a constitutional violation, plaintiff has presented sufficient facts to allow a reasonable trier of fact to find that defendant's conduct had a chilling effect upon a person of ordinary firmness. Defendant placed plaintiff under the supervision of an armed police officer and warned plaintiff that he could be arrested. (Docket Entry # 35, ¶¶ 34 & 36). Even after plaintiff made various attempts to inquire about why he was being placed under police supervision, defendant would not tell plaintiff what he had done wrong or what he should do or refrain from doing in order to avoid arrest. (Docket Entry # 35, ¶¶ 37-39). In fact, defendant initially refused even to hear plaintiff's questions about the posting of the officer or reports alleging that plaintiff made other patrons uncomfortable. (Docket Entry # 35, ¶¶ 40 & 41). When plaintiff tried to question the police officer about being placed under his supervision, the officer also refused to answer any questions. (Docket Entry # 35, ¶ 43). Finally, plaintiff was not charged with breaking any of the library's rules or with violating any

law.  (Docket Entry # 35, ¶ 6).  Plaintiff contends that as a
result, he was no longer "<u>free</u> to *frequent* the public law library
and *think freely* there" without facing the risk of being
"arbitrarily arrested" and thus left the law library and never
returned.  (Docket Entry # 35, ¶¶ 66 & 68).

A reasonable trier of fact could further find that plaintiff
acted reasonably in response to the actions taken by defendant
and that defendant's conduct would chill a reasonably hardy
individual from exercising his constitutional rights.  The facts
indicate that plaintiff made several attempts to obtain
information about why he was being placed under supervision of an
armed officer, what he was doing that was offensive to other
patrons and what he could do or should do to avoid any future
problems.  The only advice defendant gave plaintiff was that he
should generally refrain from visiting the law library as often.
Moreover, as plaintiff left the law library, the police officer
asked plaintiff when he would be returning.  Based on these facts
a reasonable jury could infer that a reasonably hardy individual
facing such an ongoing threat of arrest and/or police supervision
and unable to obtain answers as to how remedy the situation would
have been deterred from exercising his First Amendment right to
access the law library.

Viewing the record in a light most favorable to the
plaintiff, plaintiff has provided sufficient evidence to create

an issue of fact as to the chilling effect of defendant's conduct suitable for resolution by a jury.  Therefore, summary judgment is inappropriate.

Based on the preceding analysis of plaintiff's library access claim, plaintiff has met the first prong of the qualified immunity analysis by supplying enough facts to establish a First Amendment violation.

### (2)  Second Prong: Clearly Established Law

This court therefore turns to whether plaintiff's First Amendment right to access the law library was clearly established, such that a reasonable official would have known his conduct to be unconstitutional.  As set forth above, this court must consider the following to determine whether plaintiff's First Amendment right to access the law library was clearly established:  "(a) the clarity of the law in general at the time of the alleged violation; and (b) the clarity of the law as applied to the case-in other words, whether a reasonable person in defendant's shoes 'would have understood that his conduct violated the plaintiff's constitutional rights.'"  Raiche, 623 F.3d at 36 (citing Maldonado, 568 F.3d at 269) (internal bracket omitted).[8]

---

[8]  In making its determination, "a court should 'use its full knowledge of its own [and other relevant] precedents.'" See, e.g., Barton, 632 F.3d at 22 (quoting Elder v. Holloway, 510 U.S. 510, 516 (1994) (internal quotation marks omitted, brackets in original).  A court must examine whether there are "'cases of

(a) <u>Clarity of the Law in General</u>

"The law is considered clearly established either if courts have previously ruled that materially similar conduct was unconstitutional, or if a general constitutional rule already identified in the decisional law applied with obvious clarity to the specific conduct at issue." <u>Mosher. V. Nelson</u>, 589 F.3d 488, 493 (1st Cir. 2009). It is not necessary, however, that previous cases have "fundamentally similar" or "materially similar" facts in order to find that the law is clearly established. <u>See</u>, <u>e.g.</u>, <u>Savard v. Rhode Island</u>, 338 F.3d 23, 28 (1st Cir. 2003) (citing <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002)); <u>see also</u> <u>Suboh v. District Attorney's Office of Suffolk Dist.</u>, 298 F.3d 81, 94 (1st Cir. 2002). The plaintiff need not show that "either the particular conduct complained of or some materially indistinguishable conduct has previously been found unlawful," <u>Savard</u>, 338 F.3d at 28 (internal citations omitted), but "the right allegedly violated [must be defined] . . . at the appropriate level of specificity." <u>Raiche</u>, 623 F.3d at 38 (citing <u>Wilson v. Layne</u>, 526 U.S. 603 (1999)).

Plaintiff asserts "clearly established First Amendment

---

controlling authority . . . at the time of the incident . . . [or] a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful,'" <u>id.</u> (citing <u>Bergeron v. Cabral</u>, 560 F.3d 1, 11 (1st Cir. 2009; quoting <u>Wilson</u>, 526 U.S. at 603) (alterations in original), and "should search the relevant authorities both in and out of circuit." <u>Id.</u>

rights to be in, use, read, write, and think freely in the public law library." (Docket Entry # 33). In contrast, defendant argues that "[w]hile it may be clearly established that the First Amendment guarantees some level of access to public libraries, the boundaries of that right are far from clear." (Docket Entry # 29). According to defendant, existing case law instructs that "the First Amendment guarantee[s] '*some* level of access' to a public library" but "what level of access constitutes the constitutionally-required 'some level of access' remains unclear." (Docket entry # 29) (citing <u>Kreimer</u>, 958 F.2d at 1255) (emphasis in original). At issue in this case is whether prior existing case law or general First Amendment principles placed defendant on notice that it was unconstitutional to place plaintiff under police supervision and threat of arrest under the circumstances on the day in question.

The boundaries of the First Amendment right to access a public library are not as unclear as defendant argues. Whereas defendant cites various cases to support his proposition that the right is defined only insofar as to guarantee "some level" of access (Docket Entry # 29), those cases are in fact instructive as to contours of the right to access the law library. There is also additional case law, some of which predates the case law that defendant cites to, that further defines the boundaries of the First Amendment right to public library access. <u>See</u> <u>Brown v. Louisiana</u>, 383 U.S. 131 (1996); <u>see also</u> <u>Neinast v. Board of</u>

Trustees of Columbus Metropolitan Library, 190 F.Supp.2d 1040
(S.D.Ohio Mar. 27, 2002); Armstrong, 154 F.Supp.2d 67.

It is widely recognized that the public library is a limited
public forum.  See, e.g., Neinast, 190 F.Supp.2d at 1043-1044
(citing Kreimer, 958 F.2d at 1257).  As a limited public forum,
"the [l]ibrary is obligated to permit the public to exercise
rights that are consistent with the nature of the [l]ibrary and
consistent with the government's intent in designating the
[l]ibrary as a public forum," but "[o]ther activities need not be
tolerated."  Kreimer, 958 F.2d at 1257.  In a public forum,
"[r]easonable time, place and manner regulations are
permissible."  Neinast, 190 F.Supp.2d at 1043-1044; see also
Armstrong, 154 F.Supp.2d at 79 (holding public library regulation
authorizing personnel to deny access to patrons based on
"objectionable" appearance, including "barefooted, bare-chested,
body odor, filthy clothing, etc.," was overbroad under First
Amendment; term "etc." and discretion accompanying its
interpretation created standardless test placing patrons' rights
of access to ideas and information in realistic danger).
Therefore, in public libraries, "[c]ontent neutral 'time, place,
or manner regulations that limit permitted First Amendment
activities within a designated public forum are constitutional
only if they are 'narrowly tailored to serve a significant
governmental interest, and . . . leave open ample alternative
channels of information.'"  Neinast, 190 F.Supp.2d at 1044

25

(internal citations omitted).  Library rules and regulations must be "equally applicable to all and administered with equality to all" such that "regulations as to use-whether they are ad hoc or general-[must not be invoked] as a pretext for pursuing those engaging in lawful constitutionally protected exercise of their fundamental rights."  <u>Brown</u>, 383 U.S. at 143.

Defendant suggests that plaintiff's First Amendment right to access the law library is not clearly established because there is no case law about "whether a patron who makes frequent use of a library or who causes other patrons discomfort can be asked or urged to modify his behavior" or "whether the First Amendment is implicated at all if a library patron's access is *reduced* but not eliminated, or discouraged but not prohibited."  (Docket Entry 29).  Simply because this case involves "novel factual circumstances[,]" however, does not mean that the state of the law regarding the right to access a public library was not clearly established.  <u>Hope</u>, 536 U.S. at 741.  The law library had a set of rules and regulations, none of which plaintiff was ever charged to have violated.  There is no evidence that the library had a rule restricting the amount of time a library patron could occupy or use the library facilities or that the plaintiff violated such a rule.  <u>See</u> <u>Brown</u>, 383 U.S. at 150 (the First Amendment does not necessarily forbid regulations limiting "loafing in library reading rooms" but simply remaining at the library after being asked to leave absent such a regulation or

any other violation was not enough to constitute breaching the peace).  Furthermore, there is no evidence that plaintiff was being disruptive or threatening in any way.  See, e.g., Hunt v. Wise, 2009 WL 2163108 at *5 (M.D.Fla. July 17, 2009) (citing Kreimer,958 F.2d at 1242 (prohibiting disruptive behavior is perhaps the clearest and most direct way to achieve maximum library use)).  Plaintiff was placed under police supervision and threat of arrest simply because of alleged and unidentified reports that his constant presence in the library made other library patrons uncomfortable.  Whereas there is no case that is exactly on point, existing case law at the time of the incident in question was clear that the law library was a limited public forum where patrons' First Amendment rights could be restricted so long as those restrictions were generally applicable and content-neutral.

(b) Clarity of the Law as Applied

Based on the prior existing case law and the facts on record, it is evident that a reasonable officer in defendant's position would have known that his conduct was violative of plaintiff's right to access the law library.  A reasonable officer would have known that placing plaintiff, who had not violated a library rule or regulation, under police supervision and threat of arrest without informing him about what he had to do in order to continue using the law library freely and advising

27

him to refrain from visiting the law library as often, would
infringe upon plaintiff's First Amendment rights.

In light of the fact that plaintiff has set forth sufficient
facts to establish a First Amendment violation and the law
regarding the right to access a law library was clearly
established at the time of the conduct in question, a denial of
summary judgment on the basis of qualified immunity is
appropriate.

    B.  <u>Retaliation Claim</u>

In addition to his primary First Amendment claim, plaintiff
raises a section 1983 claim alleging that defendant retaliated
against plaintiff for exercising his First Amendment rights.
(Docket Entry # 5, ¶¶ 62-65).  In order to succeed on a
retaliation claim, a plaintiff must show that:  (1) plaintiff was
engaged in "constitutionally protected activity"; (2)
"defendant's conduct caused [plaintiff] to suffer an injury that
would chill a person of ordinary firmness from continuing to
engage in that activity"; and (3) defendant's conduct was
"substantially motivated against plaintiff's exercise of
constitutionally protected conduct."  <u>See</u>, <u>e.g.</u>, <u>Hickson v.
Bowler</u>, Civ. No. 08-255-B-W, 2009 WL 742737 at *6 (D.Me. March
17, 2009), (stating elements of retaliation claim and collecting
cases) (internal citations omitted).  The crux of plaintiff's
retaliation claim is essentially the same as that of plaintiff's

28

primary First Amendment claim: (1) whether defendant's conduct
would chill or silence a person of ordinary firmness from
exercising his First Amendment rights; and (2) whether defendant
intended to interfere with plaintiff's First Amendment rights.

Defendant chose not to address plaintiff's retaliation claim
separately from plaintiff's library access claim, arguing simply
that the "graveman of each allegation" is the same and thus
plaintiff's retaliation claim would be dismissed along with
plaintiff's library access claim.  (Docket Entry # 29, fn. 4).
In light of this court's preceding discussion and recommendation
regarding plaintiff's library access claim, plaintiff's
retaliation claim should also survive defendant's motion for
summary judgment.

C.  Due Process Claim

The amended complaint sets forth a section 1983 claim
alleging that defendant violated plaintiff's right to due process
of law by restricting his use of the law library based on
defendant's "personal predilections" rather than rule of law.
(Docket Entry # 5, ¶¶ 62-65).  Plaintiff argues that defendant
placed him under police supervision and threatened him with
arrest merely because he had the power to do so.  (Docket Entry #
33, pp. 3, 5 & 8).  Further, plaintiff alleges that defendant
neither mentioned what rule plaintiff was accused or suspected of
violating nor attempted to get plaintiff's version of the events.

(Docket Entry # 33, 10).

The Fourteenth Amendment protects individuals from being deprived of life, liberty or property without due process of law. United States Constitution, Amendment XIV, § 1. In order to establish a procedural due process claim, plaintiff must show that defendant's conduct deprived him of a liberty interest in using the law library. Wayfield, 925 F.Supp. at 882 (citing Board of Regents v. Roth, 408 U.S. 564, 569 (1976)); see also Pease v. Burns, 719 F.Supp.2d 143, 152 (1st Cir. 2010) (reiterating standard for establishing a due process claim) (internal citations omitted). Once that liberty interest has been established, the court must determine what level of process the plaintiff was afforded, if any, and whether that process met the requirements of the Fourteenth Amendment. See, e.g., Pease, 719 F.Supp.2d at 152 (citing Mathews v. Eldridge, 424 U.S. 319, 332 (1976) (laying out the factors that a court must balance in order to make this determination)).

(1)  Deprivation of Liberty Interest

Defendant argues that because the only "deprivation" plaintiff has alleged to have suffered is interference with his First Amendment rights and plaintiff has failed to establish a First Amendment violation, plaintiff's due process claim should also be dismissed. (Docket Entry # 29). First, based on this court's analysis of plaintiff's First Amendment claims, plaintiff

30

has provided sufficient evidence to establish a violation of his
right to access the law library.  Furthermore, a reasonable trier
of fact could find that defendant constructively expelled
plaintiff from the law library and thereby deprived plaintiff of
his liberty interest in using the library.[9]  Suspension of
plaintiff's library privileges requires due process.  <u>Wayfield</u>,
925 F.Supp. at 885 (finding library patron to be in class of "the
already-licensed," giving him a "vested interest in the license .
. . [and] foreclos[ing] denial without due process") (internal
citations omitted).

(2)  <u>Due Process Afforded & Sufficiency</u>

Having established that plaintiff has a liberty interest in
being able to access the law library, this court must determine
what due process plaintiff was afforded, if any, and whether that
process was sufficient under the Fourteenth Amendment.

In making this determination, this court must first look at
the "private interest that will be affected by the official
action."  <u>Mathews</u>, 424 U.S. at 322.  Plaintiff's claim in this
case passes the first prong of the <u>Mathews</u> test given that
plaintiff had a First Amendment right to access the law library.

Next, this court must assess "the risk of an erroneous

---

[9]  Plaintiff's liberty interest in using the law library has been
established.  <u>See</u>, <u>e.g.</u>, <u>Wayfield</u>, 925 F.Supp. at 888; <u>Kreimer</u>,
958 F.2d at 1264-1265; <u>Hunt</u>, 2008 WL 4371343 at *3; <u>Armstrong</u>,
154 F.Supp.2d at 82.

deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." <u>Mathews</u>, 424 U.S. at 321.  There is no evidence on record that plaintiff was afforded any process prior to being constructively expelled by defendant from the law library.  In fact, plaintiff was not told what rule, if any, he was violating before he was placed under police supervision.  Defendant also did not disclose the identity of the complainants or the substance of the reports received against plaintiff before he threatened plaintiff with arrest.  Moreover, there is no evidence that the law library has any rules or procedures in place for suspending library privileges.  As a result, the risk of "erroneous deprivation" appears to be great.  <u>See</u> <u>Wayfield</u>, 925 F.Supp. at 888.

Finally, this court must consider the "[g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." <u>Id.</u>  There are a number of measures that the law library could take to protect the due process rights of its library patrons that would not unduly burden the law library.  For instance, the law library could issue verbal and/or written warnings to patrons and allow them the opportunity to dispute any allegations either in person or in writing prior to taking any action to abridge or suspend library privileges.  The law library could also post written rules

setting out the types of violations that could lead to a patron's removal and guidelines outlining the process for suspension of library privileges.

Based on the preceding analysis, plaintiff alleged sufficient facts to sustain his claim that he was deprived of his right to access the law library without being afforded due process of law.  Therefore, summary judgement is not warranted.

## II.  State Law Claims

The amended complaint (Docket Entry # 5) alleges state law claims against defendant for violating plaintiff's rights under the Massachusetts Civil Rights Act (Docket Entry # 5, ¶¶ 74-76); defamation (Docket Entry # 5, ¶¶ 83-86); intentional infliction of emotional distress (Docket Entry # 5, ¶¶ 87-89); and intentional interference with advantageous relationships (Docket Entry # 15, ¶ 90-94).  On August 6, 2010, the court denied defendant's motion to dismiss these claims on grounds that the court should decline to exercise supplemental jurisdiction. (Docket Entry # 15 at 18).  The court also noted that it would revisit the issue if it allowed summary judgment on plaintiff's federal claims.  (Docket Entry # 15 at 18).  In light of this court's recommendation that the federal claims survive summary judgment, it is appropriate to exercise supplemental jurisdiction over the state law claims at this time.  Defendant argues that even if the court exercises supplemental jurisdiction, defendant

is entitled to summary judgment on each state law claim as a
matter of law.  Accordingly, this court turns to whether each
state law claim survives summary judgment.

   A.  Massachusetts Civil Rights Act

   In order to prevail on a claim under the Massachusetts Civil
Rights Act ("MCRA"), "the plaintiff must prove that the
defendant[] used 'threats, intimidation or coercion' to interfere
with, or attempt to interfere with, rights secured by the
Constitution or laws of the United States or the Commonwealth of
Massachusetts."  Mancuso v. Massachusetts Interscholastic
Athletic Ass'n, Inc., 900 N.E.2d 518, 531 (Mass. 2009) (quoting
Brum v. Dartmouth, 704 N.E.2d 1147, 1162 (Mass. 1999).  "'A
"threat" is "the intentional exertion of pressure to make another
fearful or apprehensive of injury or harm."  Id. (quoting Planned
Parenthood League of Mass., Inc. v. Blake, 631 N.E.2d 985, 990
(Mass. 1994).  "Intimidation involves putting one in fear for the
purpose of compelling or deterring conduct."  Id.  (internal
quotations and citations omitted).  "Coercion is the application
of another of force to constrain him to do against his will
something he would not otherwise have done."  Id. (internal
quotations and citations omitted).

   Plaintiff's MCRA claim is based on allegations that
defendant violated his First and Fourteenth Amendment rights "by
means of threat, intimidation, and coercion."  (Docket Entry # 5,

                              34

¶ 75).  As previously discussed, plaintiff has provided

sufficient evidence for a reasonable trier of fact to conclude

that defendant infringed upon plaintiff's right to access the law

library by constructively expelling him from the law library

without affording him due process of law.  A jury could further

find that by placing plaintiff under police supervision and

threatening him with arrest defendant intended to intimidate

plaintiff and coerce him into limiting his visits to the law

library.  Such conduct falls within that contemplated under the

MCRA as necessary to sustain a claim.  Therefore, based on this

court's preceding analysis of the federal claims and the denial

of defendant's assertion of qualified immunity, it is appropriate

to deny summary judgment on the MCRA claim.

    B.  Defamation

     To withstand a motion for summary judgment on defamation,

"the plaintiff must establish that 'the defendant was at fault [10]

for the publication of a false statement regarding the plaintiff,

capable of damaging the plaintiff's reputation in the community,

which either caused economic loss or is actionable without proof

of economic loss.[11]  (footnote omitted).'"  Dragonas v. School

_____

[10]  The level of fault required for statements concerning private
persons is negligence.  Ravnikar, 782 N.E.2d at 511.

[11]  A statement must fall within one of the following four
exceptions in order to be actionable without proof of economic
loss: "statements that constitute libel; statements that charge
plaintiff with a crime; statements that allege that the plaintiff

35

Committee of Melrose, 833 N.E.2d 679, 686-687 (Mass.App.Ct.

2005)) (quoting White v. Blue Cross Blue Shield of Mass., Inc.,

809 N.E.2d 1034 (Mass. 2004) (citing Ravnikar v. Bogojavlensky,

782 N.E.2d 508, 510-511 (Mass. 2003)).  In a defamation action,

"'a threshold issue is whether the statement is reasonably

susceptible of a defamatory meaning, and that determination is a

question of law for the court.'"  Nolan v. Krajcik, 384 F.Supp.2d

447, 473 (D.Mass. July 12, 2005) (quoting Foley v. Lowell Sun

Publ'g Co., 533 N.E.2d 196, 197 (Mass. 1989)).  Such a

determination requires the court to examine the statements in

their entirety and in the context in which they were made.

Nolan, 384 F.Supp.2d at 473 (citing Foley, 533 N.E.2d at 197).

If the statement "'is susceptible of both a defamatory and a

nondefamatory meaning, a question of fact exists for the jury.'"

Id.  (quoting Jones v. Taibbi, 512 N.E.2d 260, 264 (Mass. 1987)).

"A statement cannot[[however] be defamatory if it is

substantially true."  Nolan, 384 F.Supp.2d at 473 (citing Jones,

512 N.E.2d at 266) (which holds truth is a defense to

defamation).

     Plaintiff alleges in the amended complaint that defendant

"published the false and defamatory communication" that plaintiff

"was so inclined to commit a criminal offense in the [public] law

_____

has certain diseases; and statement that may prejudice the
plaintiff's profession or business."  Ravnikar, 782 N.E.2d at 511
(internal citations omitted).

library, for which [plaintiff] would be arrested, that it was necessary to have an armed, uniformed police officer stationed close to plaintiff." (Docket Entry # 5, ¶ 84). The actual statement upon which plaintiff bases the defamation claim, however, is defendant's statement, "You will be arrested! I have the power to do that!" (Docket Entry # 35, ¶ 36). Defendant argues that he is entitled to summary judgment because plaintiff failed to alleged that "[defendant], as a court officer, lacked the authority to effect such an arrest" and therefore failed to allege that defendant made a false statement. (Docket Entry # 29). Moreover, defendant contends that because defendant's statement was not false, "[plaintiff] has not and cannot meet his burden of showing that [defendant] was *negligent* in making a false statement." (Docket Entry # 29) (emphasis in original). This court agrees.

Even viewing the facts in the light most favorable to the plaintiff, plaintiff has failed to create an issue of fact as to the falsity of defendant's statement. Plaintiff did not make any allegations or provide any facts to suggest that defendant's statement was false. Relatedly, plaintiff has not and cannot show that defendant was negligent in telling plaintiff that he would be arrested. Finally, defendant's statement is also not defamatory per se because neither the defendant's statement nor the innuendo plaintiff sets out in his amended complaint impute to plaintiff the commission of a crime. In light of the fact

that plaintiff cannot meet one or more of the elements required
to sustain a defamation claim, summary judgment is warranted on
this claim.

C. <u>Intentional Infliction of Emotional Distress</u>

A claim for intentional infliction of emotional distress
requires the plaintiff to show:

> "(1) that the actor intended to inflict emotional distress
> or that he knew or should have known that emotional distress
> was the likely result of the conduct . . .; (2) that the
> conduct was 'extreme and outrageous,' was 'beyond all
> possible bounds of decency,' and was 'utterly intolerable in
> a civilized community . . .;' (3) that the actions of the
> defendant were the cause of the plaintiff's distress . . .;
> and (4) that the emotional distress sustained by the
> plaintiff was 'severe' and of a nature 'that no reasonable
> person could be expected to endure.'"

<u>Kennedy v. Town of Billerica</u>, 617 F.3d 520, 530 (1ˢᵗ Cir. 2010)

(citing <u>Howell v. Enter. Publ'g Co., LLC</u>, 920 N.E.2d 1, 28 (Mass.

2010) (quoting <u>Agis v. Howard Johnson Company</u>, 355 N.E.2d 315,

318-319 (Mass. 1976)). "'Emotional responses including anger,

sadness, anxiety, and distress,' which, though 'blameworthy,' are

'often not legally compensable.'" <u>Id.</u> (quoting <u>Quinn v. Walsh</u>,

732 N.Ed.2d 330, 338 (Mass. 2000).

Defendant contends that the claim for intentional infliction
of emotional distress is deficient as a matter of law. According
to defendant, none of plaintiff's allegations point to conduct
that was beyond all possible bounds of decency or utterly
intolerable in a civilized community. (Docket Entry # 29).
Furthermore, defendant argues that plaintiff has not plead any

facts that suggest he suffered emotional distress so severe that no reasonable person could endure. (Docket Entry # 29). This court agrees.

Plaintiff alleges that defendant's placing him under police supervision and threatening him with arrest "caught [plaintiff] by surprise and cause[d] [him] sudden shock and severe distress in the [public] law library." (Docket Entry # 5, ¶ 88). According to plaintiff, defendant's actions placed him "under duress" and left him "unnerved, unable to think freely, and worried about being arbitrarily arrested." (Docket Entry # 35, ¶¶ 44-46). These injuries, however, do not rise to the level of the harms that Massachusetts courts have deemed sufficiently severe to sustain a claim for intentional infliction of emotional distress. See, e.g., Homesavers Council of Greenfield Gardens, Inc. v. Sanchez, 874 N.E.2d 497, 504 (Mass.App.Ct. 2007) (finding "severe" emotional distress where plaintiff provided evidence of severe depression, suicidal thoughts, and sleeplessness for over a month); cf. Kennedy, 617 F.3d at 530 (vacating state law verdicts based on finding that a minor's fear of going to court, a fear of police, nightmares, and sleeplessness, after arrest, did not constitute "severe" emotional distress). Based on the evidence on record, plaintiff failed to provide sufficient evidence to show that he suffered "severe" emotional distress. Summary judgment on the intentional infliction of emotional distress claim is therefore proper.

D. <u>Intentional Interference with Advantageous Relations</u>

In order to prevail on a claim for intentional interference with contractual or business relations, a plaintiff must must show:

> "(1) the existence of a contract or a business relationship which contemplated economic benefit; (2) the defendant's knowledge of the contract or business relationship; (3) the defendant's intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages."

<u>Swanset Development Corporation v. City of Taunton</u>, 668 N.E.2d 333, 338 (Mass. 1996) (citing <u>United Truck Leasing Corporation v. Geltman</u>, 551 N.E.2d 20 (Mass. 1990)).

The Massachusetts Supreme Judicial Court has not "consistently distinguished between the two torts" of intentional interference with contractual or business relations and intentional interference with an advantageous relationship. <u>United Truck Leasing Corporation</u>, 551 N.E.2d 20, 23 n.6 (Mass. 1990); <u>see</u> <u>also</u> <u>Dulgarian v. Stone</u>, 652 N.E.2d 603, 609 n.8 (Mass. 1995) (paraphrasing <u>Draghetti v. Chmielewski</u>, 626 N.E.2d 862 (Mass. 1994), as treating interference with advantageous relations claim "with and under the rules for unlawful interference with contractual relations").  The necessary elements of an intentional interference with an advantageous relationship claim are:  "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's interference

with it through improper motive or means; and (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct." American Private Line Services, Inc. v. Eastern Microwave, Inc., 980 F.2d 33, 36 (1st Cir. 1992).

The distinction between the two torts primarily occurs with respect to the first element. Whereas the plaintiff must establish the existence of a contract in order to establish an intentional interference with contractual or business relations claim, a plaintiff need not establish an existing contract with respect to an intentional interference with an advantageous relationship claim. See American Private Line Services, Inc., 980 F.2d at 35-36 (discussing elements for both torts). Thus, under the latter tort, the plaintiff need only establish "[a] probable future business relationship from which there is a reasonable expectancy of financial benefit." Powers v. Leno, 509 N.E.2d 46, 49 (Mass.App.Ct. 1987) (internal quotation marks and citation omitted); accord American Private Line Services, 980 F.2d at 36 (citing Powers for this principle).

Defendant argues that plaintiff "had neither a business relationship nor an actual or contemplated contractual relationship with the law library" and therefore he is entitled to summary judgment as a matter of law on plaintiff's intentional interference with advantageous relationships claim. (Docket Entry # 29). This court agrees.

41

In the amended complaint, plaintiff alleges that he had an advantageous relationship with the law library through which he gained access to the law and to the courts and thus was able to use the law library to his "economic advantage." (Docket Entry # 5, ¶ 91). Plaintiff fails to offer any evidence to show that he had such an existing business relationship, or that he had an actual or future contractual relationship with the law library through which he could expect an economic benefit. Plaintiff also fails to provide any facts that support his assertion of an economic advantage. In light of the fact that plaintiff cannot establish the first element of a claim for intentional interference with advantageous relations, the claim is subject to summary judgment.

CONCLUSION

In light of the foregoing discussion, this court **RECOMMENDS**[12] that the defendant's motion for summary judgment (Docket Entry # 28) be **DENIED** as to the plaintiff's federal claims and the MCRA claim and **ALLOWED** as to the state law claims for defamation, intentional infliction of emotional distress and

---

[12] Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt of the Report and Recommendation to which objection is made and accompanied by the basis for such objection. Any party may respond to another party's objections within 14 days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order. See Rule 72, Fed. R. Civ. P.

intentional interference with advantageous relations.

                        /s/ Marianne B. Bowler
                        **MARIANNE B. BOWLER**
                        United States Magistrate Judge